ROBERTA HILL WHITE, RESPONDENT, v. MISSOURI MOTORS DISTRIBUTING COMPANY, APPELLANT.—47 S. W. (2d) 245.

Kansas City Court of Appeals.    February 1, 1932.

454

*E. E. Thompson, Charles N. Sadler* and *I. F. Bradley* for respondent.

*McCune, Caldwell & Downing* for appellant.

BLAND, J.—This is an action to recover for the death of plaintiff's husband, alleged to have been caused by the negligence of defendant. There was a verdict and judgment in favor of plaintiff in the sum of $7500 and defendant has appealed.

The facts show that defendant is engaged in the transportation of freight by truck between the cities of St. Louis and Kansas City. Deceased was killed a few miles east of Columbia about 1:30 A. M. of July 7, 1929. He was driving an automobile eastwardly on highway No. 40, when it came into collision with one of defendant's trucks proceeding in the opposite direction on said highway. The truck in question was being driven by an employee of defendant, one Alexander. The truck and the automobile each had two headlights burning. The highway at the place of the collision is straight for some distance in both directions. It is paved with concrete eighteen feet in width. There are dirt shoulders on each side of the pavement. There is a black line running along the center of the pavement. Deceased was seated on the left side of the car which he was driving and to his right, in the same seat, was located his father and in the rear seat, two women and a child. The driver of the automobile and one woman were killed outright and the other two adult occupants of the automobile were injured.

Deceased's father testified that he first saw the truck approaching when it was a long city block, or about 600 feet, ahead; that the truck at that time was apparently on its proper side of the road or

the north side of the black line; that he did not see the truck turn or cross the line but that the car in which the witness was riding was at all times on its own side of the road or the south side of the line; that the truck struck the automobile in "front of the front seat . . . and left side" of the automobile.

Plaintiff's witness, Eva Wilson, testified that she was in the rear seat of the automobile and that she first saw the truck when it was about a quarter of a mile away; that at this time both wheels of the truck were over on the wrong or the south side of the black line; that the truck continued in that position until the collision; that when she first saw the truck the car in which she was riding was proceeding at the rate of about forty miles an hour; that when the two vehicles were about forty feet apart the driver of the automobile turned off of the pavement; that all four wheels of the automobile were on the dirt shoulder at the time it was struck by the truck.

Plaintiff introduced other witnesses who did not see the collision but who, a short time thereafter, examined marks made upon the pavement by the tires. These witnesses testified to the effect that the wheels of the truck crossed the center or black line about twenty feet east of the point of the collision. The evidence on both sides tends to show that after the collision the truck was standing on the south side of the road with the left front corner thereof embedded in a clay bank and that the automobile was stationed on the south side of the pavement and ninety to 100 feet east of the truck.

Alexander, the driver of the truck, who testified for the defendant, stated that he first saw the automobile approaching when it was about 200 or 300 feet from him; that at that time he was proceeding at about the rate of twenty-five miles per hour; that he started to slow down the truck and at the time of the collision he was going at the rate of about fifteen miles per hour; that proceeding at the rate of twenty-five miles per hour the truck could have been stopped within fifteen to thirty feet; that he, at all times, was on his, or the north side, of the black line; that when he first saw the automobile "it was astraddle the black line, and it went a little then to the left and then to the right and then hit me;" that at the time of the collision he was "as far to the right (going west) on the slab as could be;" that the automobile struck the truck on the latter's left side near the front; that at that time he lost control of the truck and it ran off to the south of the pavement into the bank; that in addition to the two headlights there were two green lights and a lighted sign on the truck; that when the automobile struck the truck the former was headed in a northeasterly direction; that at the time the automobile turned toward the north the last time it was about four feet from the truck; that it ran about two feet over the line in a northeasterly direction before it struck; that the automobile was traveling "at a

high rate of speed;'' that after the collision both vehicles were on the south side of the line.

The evidence show that the truck was about fifteen feet in length and approximately seven feet wide. There was evidence tending to show that the automobile which deceased was driving was going at a rate of from forty to fifty miles per hour shortly before the collision. There was other testimony on the part of the defendant that the automobile came toward the truck ''zig-zagging'' in the highway. The driver of another truck of defendant, which was a little ahead of the one in the collision, testified that when he passed the automobile it was partly over on the north side of the black line.

Defendant insists that the court erred in permitting plaintiff, on cross-examination of defendant's witness, Alexander, to show that he had been discharged by defendant and that he had not been in any accident between the time of the one in question and the time of his discharge. He testified that he had made two or three trips to St. Louis as defendant's driver after the accident in question before he was discharged. He was not asked whether he was discharged on account of having this accident. We think defendant's contention must be sustained. [Hewitt v. Ry., 167 Mass. 483; Webster v. Orr (Calif.), 163 Pac. 361; N. Y. P. M. S. & H. v. Mason et al., 155 N. Y. S. 200; Engel v. United Traction Co., 203 N. Y. 321; Buchanan v. Flinn, 51 Pa. Sup. 145; Mahaney v. St. L. & H. Ry. Co., 108 Mo. 191; Schermer v. McMahon, 108 Mo. App. 36; Bujalo v. St. L. Basket & Box Co., 227 S. W. 844.]

However, plaintiff contends that this evidence was brought out on cross-examination and that it was for the purpose of impeaching the witness; that a witness may be asked any question on cross-examination no matter how irrelevant it may be, if it tends to impeach him, except where the answer would expose the witness to a criminal charge. In making this contention plaintiff states:

''If he were fired for having the accident it would surely tend to show one of two things: First, that he reported to his employer a different state of facts than those testified to by him; or the employer, upon making its own investigation, arrived at the conclusion that its driver was at fault.''

It would have been competent, for impeachment purposes, for plaintiff to have brought out that Alexander reported to the defendant a contradictory state of facts to those he testified to, but it would not tend to impeach the witness to show that defendant, upon making its own investigation, arrived at the conclusion that Alexander was at fault. There was no attempt made to show that Alexander made a report to the defendant or one containing a different state of facts than testified to by him. The fact that he was discharged

does not tend to show that he made such a report, but such would be left to mere speculation.

However, it is said that the evidence shows that Alexander made two or three trips before he was discharged, and this, together with the further fact that he had no further accident, "would tend to show that he was fired for some reason other" than having the accident in question. This contention is wholly inconsistent with plaintiff's theory at the trial in eliciting this objectionable testimony and we think there is nothing in the point. The evidence was plainly introduced for the purpose of having the jury infer that Alexander was discharged on account of having the accident in question.

It is contended that because defendant had already shown that Alexander was no longer in its employ, that it first injected into the case the matter of his being out of the employ of the defendant, and that this warranted plaintiff in going into the whole situation upon cross-examination. The testimony of Alexander was by deposition and defendant now claims the reason it showed he was no longer in its employ "was to lay the foundation for use of the deposition at the trial against possible objection that defendant could have the witness there in person." At the very start of the deposition it was brought out by defendant that Alexander was leaving Kansas City where he resided when the deposition was taken and, so far as he knew, he would not return. Just why he was asked by defendant, in the middle of his deposition, if he was no longer in its employ, is not clear, but assuming that it was for the purpose of showing that he was a disinterested witness, this would not justify the plaintiff in showing that he was discharged. The matter of his discharge could not be said to have been injected into the case by defendant by the mere showing by it that Alexander was no longer in its employ. Plaintiff no doubt could have attempted to bring out that Alexander was still in defendant's employ, or could have asked the witness questions to show that there was some other friendly relationship between the two, in order to counteract the inference of disinterestedness on the part of the witness, but a showing that the witness was discharged did not tend to dispute that kind of disinterestedness, but if anything, it would tend to give rise to an inference that the witness was unfriendly to defendant. It, therefore, is quite plain that the purpose of plaintiff in injecting the matter into the trial was to show that defendant had arrived at the conclusion that Alexander was at fault in reference to the collision between the truck and the automobile. This is the very thing that the cases we have cited hold should not be permitted by evidence of this character. We have examined the cases cited by plaintiff in connection with this point and find them not in point.

However, it is claimed by plaintiff that there was no objection made to the testimony in question at the time that it was read to the jury. The record shows that the matter of the competency of the testimony of this witness was settled by the trial court in chambers prior to the reading of the deposition to the jury. At this time the proper objections were made to the questions and answers contained in the deposition and the objections were overruled by the court. The matter thus being finally settled, before the questions and answers were read to the jury, it was unnecessary for defendant to make further objection to the testimony. [Schierbaum v. Schemme, 157 Mo. 1, 22.]

The testimony of plaintiff's witness, Eva Wilson, was also by deposition and the matter of the competency of certain parts of her testimony was likewise settled in chambers before the deposition was read. Her deposition shows, upon her cross-examination, that she had given a statement to the defendant which was very contradictory in many material respects to her testimony at the trial. Her testimony on re-direct examination, show that she had settled her lawsuit with defendant. She testified that she did not sign the statement at the time of the settlement or in contemplation of it; that she signed it six or seven weeks before the settlement. In chambers counsel for defendant objected to the question on re-direct examination as to whether the statement was in contemplation of the settlement, but the court ruled, if defendant in reading the cross-examination of the witness to the jury brought out, or made any reference to the settlement that the court would permit the questions and answers on re-direct examination relative to the settlement, otherwise, he would not. It is plaintiff's contention that the testimony relative to the settlement was admissible on the theory of surprise or entrapment and that one may impeach his own witness' testimony on this theory.

Defendant did not read to the jury any part of the witness' cross-examination in reference to the statement but now contends that the court erred in its ruling. We think defendant is in no position to make this point for the reason that if it thought at the time that it had a right to read the statement to the jury, it should have done so and then, had plaintiff attempted to get before the jury the question of settlement, it should have objected to the same. It was not until then that the court was forced to make a final decision in reference to the competency of the testimony. Under the facts in connection with this matter, the statement of the court as to what he would do should the contingency arise is not equivalent to his doing it. [State ex rel. v. Buckner, 207 Mo. App. 48.] The conduct of the defendant in not introducing the statement was equivalent to acquiescence in the court's ruling.

No doubt the situation will arise at another trial and if defendant pursues the right course its objecton should be sustained. [22 C. J. p. 320.] The evidence shows that the statement was not made in connection with the settlement and, even if it were, there is no question of surprise or entrapment involved. There is nothing in the law which compelled plaintiff to use the deposition and if she elected to do so nothing in the deposition could be construed as a surprise. The testimony of the witness was all before her prior to its introduction. She was in the same situation as if she had placed the witness on the stand at the trial, knowing exactly as to what she would testify. But we do not think that, even had the witness testified that she gave the statement in connection with the settlement of her case, the fact that she had so settled her case would tend to impeach her in reference to her testimony at the trial. On the contrary, in so far as her testimony at the trial was concerned, it would be in the nature of rehabilitation. In other words, the fact of settlement might tend to show that what she said at the trial was the truth, and that what she said in the statement was false, because she might have been attempting to effectuate a settlement when she made it. We need not say whether the fact of settlement would have been admissible on this theory, as the record shows that the settlement and the statement had nothing to do with each other.

Complaint is made of the giving of plaintiff's instruction No. 2. This instruction submitted the humanitarian theory to the jury. It first required the jury to find that the collision occurred on the south side of the road. It told the jury that if they found that the driver of the truck "allowed or permitted the truck . . . to run over and upon the south or left side of the road" and strike the automobile and that he could have, by the exercise of the highest degree of care, "kept said truck from running on the south or swerved said truck, if so, or to have slowed same down, if so, or to have given warning of his intention to turn said truck, if so, and could by doing either or any of the above things, have avoided striking the automobile which said Ralph White was driving, or killing said Ralph White, and negligently failed to do so, if so, then you are instructed that under such circumstances, your verdict should be in favor of plaintiff and against defendant, even if you should further find and believe from the evidence the said Ralph White was also negligent himself."

We think this instruction is undoubtedly erroneous. There is no room for the application of the humanitarian theory in this case. As is well said in the case of Phillips v. Henson, 30 S. W. (2d) 1065, 1067:

"Defendant owed plaintiff no duty under the humanitarian rule until he saw or by the exercise of the highest degree of care could have seen him in a position of peril and either oblivious thereto or unable to extricate himself."

There is no claim of inextricability in this case, nor is there any showing of obliviousness on the part of the driver of the automobile. Of course, if the truck, when it reached a point twenty feet west of the automobile, suddenly swerved to the south and over the center line, then the driver of the automobile was in a position of peril when the truck turned, but any negligence on the part of the driver of the truck, prior to its turning, was antecedent negligence and not humanitarian negligence. [Phillips v. Henson, supra.] There was nothing that the driver of the truck could have done after he turned to have avoided the collision. His failure to give a warning of his intention to turn (had one been effective) was likewise, antecedent negligence. [See case last cited.] If the truck was driven upon the wrong side of the road for a quarter of a mile before the collision deceased was not in peril, as the truck could have been turned back to its side of the road at any time until the driver of the truck decided not to turn back after he saw deceased was not going to get out of his way. There is nothing in the record tending to show when this was, short of the point of the collision. Before the driver of the truck so decided not to turn back anything he did or failed to do was antecedent negligence. Under the circumstances, plaintiff's instruction No. 2 was erroneous.

Complaint is also made of the giving of plaintiff's instruction No. 1. This instruction is upon primary negligence and not upon the humanitarian theory. It had the jury find that the automobile was being driven on the proper side of the road; that the driver thereof was exercising the highest degree of care for his own safety and that the driver of the truck "caused, allowed, or permitted the truck which he was driving *to run upon or over to* the south or left side of the road, if so, and if you further find and believe from the evidence that as a direct result thereof said truck did strike and collide with the automobile" the verdict should be in favor of plaintiff and against defendant. (Italics ours.)

Defendant insists that this instruction covers the whole case without requiring the jury to find that defendant was negligent and that the facts submitted in the instruction do not show negligence, as a matter of law. It is true that it is not always negligent to drive upon the wrong side of the highway. However, the undisputed testimony shows that these two vehicles were proceeding in opposite directions; that the pavement was only eighteen feet in width; that the driver of each vehicle saw the other closely approaching and that

there was no other vehicle, obstruction or cause of any kind to excuse either one for straying from his own side of the road.

There is a dispute between the parties as to whether or not sections 7775, 7777 (b), Revised Statutes 1929, are applicable to the facts in this case. It is claimed that if they are applicable, then to drive upon the wrong side of the road was negligence *per se*. Defendant claims that they are not applicable. Assuming that, as a matter of fact, they are not, there is no question but that at common law to have driven either vehicle upon the wrong side of the road, not when they were a quarter of a mile apart, but when they were closely approaching each other, would have been negligence as a matter of law. [Edwards v. Yarbrough, 201 S. W. 972; Columbia Taxicab Co. v. Roemmich, 208 S. W. 859, 861.] It was not negligent, as a matter of law, to drive upon the wrong side of the road when the vehicles were a quarter of a mile apart. Therefore, this instruction should be amended so as not to so assume.

We think, that, at another trial, plaintiff should omit the words "over to" now in the instruction, for the reason that there is no testimony in the record, or any theory disclosed at the trial, tending to show that each vehicle was upon its own side of the road at the time of the collision. The use of the words "over to" disjunctively with "run upon" carries the idea that the collision may have occurred with each vehicle upon its own side of the road, but at the center thereof in such close positions as to come into contract with each other.

The birth certificate was not admissible in evidence and it should be excluded at another trial. While its introduction may not have amounted to reversible error, it was error to allow its introduction.

Complaint is made of the giving of plaintiff's instructions No. 8 on the measure of damages. This instruction is not substantially different from that condemned in Treadway v. United Rys. Co., 300 Mo. 156. However, the Supreme Court, since deciding the Treadway case, has gotten away from the holding therein to such an extent that it is impossible to state under what circumstances the giving of an instruction, similar to the one in the case at bar, constitutes reversible error. [See McDaniel v. Davis, 266 S. W. 710; Ward v. Mo. Pac., 277 S. W. 908; State ex rel. v. Bland, 281 S. W. 690.] In the last mentioned case the court intimated that under some circumstances the giving of such an instruction is error, but what those circumstances are is not indicated or intimated in the opinion. So it would be well for the plaintiff herein to redraft this instruction.

At another trial the court should give an instruction on the part of the defendant to the effect that, if at the time of the collision in question no part of the truck was upon the south side of the center

line of the highway in question, the verdict should be for the defendant. This was attempted to be submitted in defendant's refused instructions E and F. Plaintiff criticizes the wording of these instructions, but they can be so amended, without changing their value to defendant, as to eliminate any doubt as to their meaning.

The judgment is reversed and the cause remanded. All concur.