**James Steven COVERT, Petitioner/Appellant,**

v.

**Carol Russell FISHER, Director of Revenue, for the State of Missouri, Respondent/Respondent.**

**No. ED 83943.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 19, 2004.

Rehearing Denied Dec. 9, 2004.

Alan Kimbrell, Chesterfield, MO, for appellant.

Shelly A. Kintzel, Jefferson City, MO, for respondent.

KATHIANNE KNAUP CRANE, Judge.

Petitioner appeals from the judgment of the circuit court upholding the suspension of petitioner's driver's license by the Director of Revenue (the director) pursuant to Section 302.505 RSMo (2001 Supp.). The suspension was based on petitioner's arrest for driving a golf cart while intoxicated on the streets of a private subdivision. On appeal, petitioner contends that the circuit court erred in upholding the suspension because the golf cart was not a motor vehicle, and also erred in taking judicial notice of other persons' use of golf carts. We affirm.

On May 11, 2002, at approximately 7:04 p.m., Corporal John Oliveras of the Missouri State Highway Patrol responded to a report of an accident with injuries on Deborah Drive at Judith Circle in the Las Bresas Lake subdivision in Franklin County, Missouri. Upon arriving at the scene, Corporal Oliveras observed an overturned golf cart partially on and partially off the roadway at the intersection of Deborah Drive and Judith Circle. He saw children being attended by firefighters and EMS personnel. He determined that the golf cart may have struck a sign on the side of the road, had overturned, and had ejected the driver and several children, and that petitioner had been pinned under the driver's side of the cart. The golf cart was a 1997 Easy–Go model with an internal combustion engine, steering wheel, accelerator pedal, brake pedal and roll bar.

Corporal Oliveras spoke with petitioner, who was on a gurney in the back of an ambulance. Corporal Oliveras testified

that petitioner said he had been "riding" in the golf cart with his four-year-old son on his lap and three or four other passengers. He had "turned in" and hit a sign. When Corporal Oliveras asked petitioner if he had been drinking, petitioner responded that he had "a couple of beers." Corporal Oliveras observed that petitioner's eyes were bloodshot and watery, there was a strong odor of intoxicants on petitioner's breath, and his speech was slurred and somewhat difficult to understand.

Corporal Oliveras performed a horizontal gaze nystagmus test on petitioner. He asked petitioner to recite the alphabet, and petitioner said he did not know it. He did not administer any other field sobriety tests because petitioner was in the ambulance and the paramedics wanted to leave. Corporal Oliveras concluded that petitioner had been driving while intoxicated. Corporal Oliveras told petitioner he was under arrest for operating a motor vehicle while intoxicated, and another officer would contact him when he arrived at the hospital.

Corporal Oliveras testified that police have jurisdiction to patrol the Las Bresas Lake subdivision. Emergency vehicles, mail delivery vehicles, and members of the public may freely drive into the subdivision. On cross-examination, he testified that the subdivision roads are private roads, maintained by the subdivision and not by the state or the county, but are "open for use."

Trooper Ryan Barr proceeded to the emergency room at St. John's Mercy Hospital where he contacted petitioner. Trooper Barr informed petitioner of his Miranda rights and his rights under the Implied Consent Law. Trooper Barr asked petitioner the questions from the Alcohol Influence Report. Petitioner agreed to a blood alcohol test at Trooper Barr's request, which was performed by a qualified phlebotomist. Petitioner's blood test results showed .16% blood alcohol by weight.

The director thereafter suspended petitioner's driver's license pursuant to Section 302.505 RSMo (2001 Supp.), and the suspension was upheld after a hearing. Petitioner filed a petition for a trial *de novo* in the Circuit Court of Franklin County pursuant to Section 302.311 RSMo (2000), requesting the court to set aside the suspension of petitioner's driving privileges. After a hearing, the trial court denied petitioner's request, finding that the arresting officer had probable cause to arrest petitioner, and that petitioner had a blood alcohol content of .08% or more by weight.

On appeal, we review the trial court's judgment, not the administrative order revoking driving privileges. *Barlow v. Fischer,* 103 S.W.3d 901, 905 (Mo.App. 2003). In so doing, we will affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Verdoorn v. Director of Revenue,* 119 S.W.3d 543, 545 (Mo. banc 2003); *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the judgment and disregard all evidence and inferences to the contrary. *Bain v. Wilson,* 69 S.W.3d 117, 120 (Mo. App.2002). We defer to the trial court's credibility determinations. *Verdoorn,* 119 S.W.3d at 545. However, we do not defer to the trial court's judgment if the real issue is the legal effect of the evidence. *Id.*

We may affirm the judgment in a court-tried case if it is sustainable on any ground, not just the ground given. *Lough v. Rolla Women's Clinic,* 866 S.W.2d 851, 852 (Mo. banc 1993). If the result is cor-

rect, we do not need to agree with the trial court's reasoning in order to affirm, and we will affirm even if the trial court gives a wrong or insufficient reason. *Fix v. Fix,* 847 S.W.2d 762, 766 (Mo. banc 1993); *Graue v. Mo. Property Ins. Placement,* 847 S.W.2d 779, 782 (Mo. banc 1993).

■ In order to make a prima facie case for the suspension of a person's driver's license pursuant to Section 302.505, the director must establish by a preponderance of the evidence that (1) the driver was arrested upon probable cause for an alcohol-related offense; and (2) at the time of the arrest, the driver's blood alcohol content was at least eight-hundredths of one percent or more by weight. Section 302.505.1 RSMo (2001 Supp.); *Verdoorn,* 119 S.W.3d at 545. The director has the burden to establish the grounds for suspension or revocation by a preponderance of the evidence. *Verdoorn,* 119 S.W.3d at 545. After the director establishes probable cause for the arrest and an alcohol level in excess of the legal limit, a presumption of intoxication arises. *Id.* The driver may then rebut the *prima facie* case with evidence that his alcohol concentration did not exceed the legal limit. *Id.* The driver's burden is one of production, not of persuasion. *Id.* at 546. The director retains the burden of proof throughout the proceeding. *Id.*

■ For his first point petitioner asserts that the trial court erred in upholding his suspension "because the golf cart was not a motor vehicle in that golf carts are not used on highways." We disagree.

■ Petitioner's license was suspended under section 302.505 because he was "driving a motor vehicle" while intoxicated. Section 302.010(9) RSMo (2000) defines "motor vehicle," as used in Chapter 302, as "any self-propelled vehicle not operated exclusively upon tracks except motorized bicycles, as defined in section 307.180, RSMo." Because there is no dispute that the golf cart was "self-propelled," was not operated exclusively on tracks, and was not a motorized bicycle, we focus on whether it was a "vehicle." *See Stonger ex rel. Stonger v. Riggs,* 85 S.W.3d 703, 707 (Mo.App.2002) (riding lawnmower). "Vehicle" is defined as "any mechanical device on wheels, designed primarily for use, or used on highways, except motorized bicycles, vehicles propelled or drawn by horses or human power, or vehicles used exclusively on fixed rails or tracks, or cotton trailers or motorized wheelchairs operated by handicapped persons." Section 302.010(23) RSMo (2000). The golf cart is a mechanical device on wheels. Although it is not designed primarily for use on highways, it will fit into the definition if it was "used" on a "highway." *Stonger,* 85 S.W.3d at 708. Actual use on a highway at the time of the culpable event will satisfy the definition. *Id.* Thus, a self-propelled mechanical device on wheels, not designed primarily for use on highways, is a motor vehicle, if it was being used on a "highway" at the time its driver was intoxicated.

■ Petitioner's argument under this point assumes, without citation of supporting authority, that the golf cart was not being used on a "highway" at the time its driver was intoxicated. The law does not support this assumption.

"Highway" is defined in Chapter 302, regulating drivers licenses, as "any public thoroughfare for vehicles, including state roads, county roads and public streets, avenues, boulevards, parkways, or alleys in any municipality[.]" Section 302.010(6) RSMo (2000). This definition originally appeared in Section 3, L.1921, 1st Ex. Sess., p. 76, a new chapter that regulated motor vehicle registration, ownership, operation, equipment, use, safety and traffic on the highways. *Id.* at Section 2. Over

the years, as the legislature enacted more expanded provisions governing motor vehicles and separated these provisions into different chapters, it continued to define "highway" in identical language. *See* Section 7759 RSMo (1929); Section 8367 RSMo (1939); Sections 301.010(4) and 302.010(3) RSMo (1949); Sections 301.010(6), 302.010(9), and 304.025 RSMo (1959); Sections 301.010(9), 302.010(7), and 304.025 RSMo (1969); Sections 301.010(9), 302.010(7), and 304.025 RSMo (1978); Sections 301.010(13), 302.010(6), and 304.025 RSMo (1986); Sections 301.010(18), 302.010(6), and 304.025 RSMo (1994).

At present, in addition to Chapter 302, section 301.010(19) RSMo (2000) contains the identical definition of "highway" for Chapter 301, which governs registration and licensing of motor vehicles; for sections 304.010–40 and 304.120–.260 RSMo (2000), which govern traffic regulations; and for sections 307.010–.175 RSMo (2000), which govern vehicle equipment regulations. Section 304.025 also contains the identical definition of "highway" for sections 304.014–.026 RSMo (2000), which govern rules of the road.

In 1930 the Missouri Supreme Court construed the word "highway," as defined in Section 3, L.1921, 1st Ex.Sess., p. 77, to apply to any roads of the state where the public is accustomed to travel. *Phillips v. Henson*, 326 Mo. 282, 30 S.W.2d 1065, 1068 (1930). It held that the word "highways" was used in the statute "in its popular rather than its technical sense, and was intended to include all highways traveled by the public, regardless of their legal status." *Id.* The court quoted from an Arkansas Supreme Court case, construing a statute prohibiting drunkenness on a "public highway, street, park, or thoroughfare," as follows:

The word 'highway,' as used in this statute, was intended to embrace any road or thoroughfare used and traveled by the public, even though the same was not laid out by the county court and technically designated as a public road or highway. 'Highway' is used in its popular rather than its technical sense, and is synonymous with 'road', which is 'an open way of public passage for vehicles, persons, and animals.' Webster's New International and Funk & Wagnall's Dicts.

There was testimony in the record tending to show that the appellant was in an intoxicated condition on a 'road' leading from the church house at Mt. Maria, which was being traveled by the public, and also on the street in Murfreesboro. This testimony was sufficient to sustain the charge as far as the word 'highway' is concerned, for a 'street' is 'a public highway.' Webster's New International Dict. The road was being used by the public.

*Id.,* quoting *Simmons v. State,* 149 Ark. 348, 232 S.W. 597, 599 (1921). The court held that evidence of automobile and other vehicular traffic on the street "would warrant a finding that the street was traveled by the public generally and was a highway within the meaning of the statute." *Phillips,* 30 S.W.2d at 1068.

In *Crocker v. Jett,* 93 S.W.2d 74 (Mo. App.1936), we applied and quoted *Phillips* to reject a defendant's claim that there was no evidence that he was operating an automobile on a "public highway," as required by section 7775 RSMo (1929) (operation of motor vehicles) and defined in section 7759 RSMo (1929), because there was evidence that the highway in question was a "public traveled road." *Id.* at 76. In *Kelly v. Lahey,* 232 S.W.2d 177 (Mo. App.St.L.1950), we again applied this rule and quoted *Crocker* to hold that a privately-owned bridge was a "highway," as that term was used in section 8383 RSMo

(1939) and defined in section 8367 RSMo (1939). *Kelly*, 232 S.W.2d at 181. *See also Eoff v. Senter*, 317 S.W.2d 666, 671 (Mo.App.1958) holding that the word "highways," as used in Section 304.010 RSMo (1949) and defined in section 301.010 RSMo (1949), was intended to include "all highways traveled by the public regardless of their legal status."

In *State ex rel. Audrain County v. City of Mexico*, 355 Mo. 612, 197 S.W.2d 301 (1946), the Supreme Court considered the use of the word "highways" in section 8366 RSMo (1939), regulating the use of motor vehicles on the public highways, as defined in section 8367 RSMo (1939). *Id.* at 303. In considering whether the city of Mexico could regulate parking on streets owned by a county as its private property, it cited *City of Clayton v. Nemours*, 353 Mo. 61, 182 S.W.2d 57 (1944), for the principle that "[t]he law of the road extends to all public highways, de jure or de facto, embracing ways on private property if used for public travel." *Id.* at 304, 182 S.W.2d 57. *See also McTeer v. Clarkson Const. Co., Inc.*, 807 S.W.2d 174, 177–78 (Mo.App.1991) (construing "highway" as used in section 304.010.1 RSMo (1978)).

In *City of Clayton*, which the courts in *Audrain County* and *McTeer* cited, the Missouri Supreme Court held that the word "public," when applied to highways in the context of governmental police power to regulate parking on a privately-owned street used by the public, describes use, not ownership. 182 S.W.2d at 60. It explained:

> In determining whether a way is a public or private highway, the use to which the way is put; i.e., whether public or private, is of greater importance than its ownership, its mode of creation or its designation as public or private; because it would tend to create confusion and danger to the traveling public if

privately owned highways open to and used by the general public enforced their own rules of the road, free from legitimate public regulation, upon travelers leaving the publicly owned highways and entering upon the privately owned ways; for instance, a requirement of operation on the left hand side of the way et cetera. Consequently: 'The law of the road extends to all public highways, however created, and may also be applicable to roads not public highways, if used for travel.' 40 C.J.S., Highways, p. 256, Section 236, subsec. b.

*Id.*

 The fact that the legislature has kept the definition of "highway," which *Phillips* construed in 1930, to the present day, re-enacting it numerous times in motor vehicle and drivers license statutes, indicates that it adopted the construction the courts have given to this definition.

> A familiar rule requires that where the legislature, after a statute has received a settled judicial construction by the courts of last resort, re-enacts it, or carries it over without change, or re-incorporates the exact language theretofore construed, it will be presumed that the legislature knew of and adopted this construction.

*Duckworth v. United States Fidelity & Guaranty Co.*, 452 S.W.2d 280, 286 (Mo.App.1970). *See also Citizens Elec. v. Dir. of Dept. of Rev.*, 766 S.W.2d 450, 452 (Mo. banc 1989); *Jantz v. Brewer*, 30 S.W.3d 915, 918 (Mo.App.2000). When the legislature continues to re-enact the same language, and only changes the statute's number, it intends for the statute to carry the interpretation previously given it by the courts. *Bunker v. Rural Elec. Co-op.*, 46 S.W.3d 641, 645 (Mo.App.2001). *See also State ex rel. Steed v. Nolte*, 345 Mo. 1103, 1107–08, 138 S.W.2d 1016, 1019 (Mo.1940). "It is a rule of statutory construction that,

where one statute is patterned after another, and the earlier statute has been theretofore construed, it is presumed such construction was contemplated in the later enactment." *Bennett v. Langworthy*, 49 F.2d 574, 576 (8th Cir.1931) (construing identical definitions).

In this case the definition of "highway" reenacted by the legislature in Section 302.010(6) RSMo (2000) has consistently been interpreted to apply to any street used for public travel, even if the street is privately owned. Accordingly, the fact that the streets on which petitioner was driving the golf cart were "private" streets maintained by the subdivision does not prevent the streets from being considered "highways" as that term is used in Chapter 302 when there is evidence that the streets were open for use and used by the public. Point one is denied.

For his second point petitioner argues that the trial court erred in taking judicial notice of another person's use of golf carts on highways. This point is moot in light of our holding that petitioner's own use of a golf cart on Deborah Drive and Judith Circle satisfied the statutory definition. Point two is denied.

The judgment of the trial court is affirmed.

PATRICIA L. COHEN, P.J., and ROBERT G. DOWD, JR., J., concur.